# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 13, 2010      Decided December 28, 2010

No. 07-5352

KEITH MAYDAK, ET AL.,
APPELLANTS

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:97-cv-02199)

---

*Jaclyn L. DiLauro*, Student Counsel, argued the cause as appointed *amicus curiae* in support of appellants. On the briefs were *Steven H. Goldblatt*, appointed by the court, *Charlotte Garden* and *Kate Bushman*, Supervising Attorneys, and *Ekanem O. Akpakip*, *Jimmy T. Dean*, and *William J. Durken*, Student Counsel.

*Paul Lee*, *Keith Maydak*, and *Gregory A. Smith*, pro se, were on the briefs for appellants.

*Alan Burch*, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: BROWN, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: This is the third time that we have heard an appeal involving the parties in this case. This litigation is now thirteen years old and, unsurprisingly, it presents a weighty and complicated record. The case concerns trust fund claims brought pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 1321, and Privacy Act claims arising under 5 U.S.C. § 552a(g)(1). The appellants, Keith Maydak, Paul Lee, and Gregory A. Smith, were incarcerated in federal prison facilities when this action was initiated in the District Court, but they are no longer in federal custody. Their action was lodged against the Bureau of Prisons ("BOP") and the United States (collectively, "the Government").

Appellants' complaint is aimed at the operation of inmate photography programs at several BOP correctional facilities. The photo programs allow inmates to have their pictures taken, either by themselves or with visitors, at the cost of $1.00 per photo. The cost of the program is covered by monies from the Inmate Trust Fund, a trust administered by the United States government that provides programs, goods, and services to federal prison inmates nationwide. Until recently, several prison facilities that participated in the program regularly obtained two copies of each photograph, giving one print to the inmate while retaining the duplicate print. These duplicates were reviewed by BOP officials for various purposes, including detection of inappropriate inmate gestures or relevance to internal investigations of suspected gang activity.

In 1997, upon learning that BOP officials were secretly retaining duplicate prints, Lee, along with two of his fellow inmates, Maydak and Ambrose Mitchell, the latter of whom was

eventually replaced in this litigation by Smith, filed a complaint in the District Court. They alleged, in relevant part, that (1) BOP's charges for and uses of the duplicate prints for security-related purposes violated the terms of the Trust; and (2) BOP's undisclosed retention of duplicate prints violated various provisions of the Privacy Act. Throughout this litigation, the Government has maintained that BOP's retention of unsorted duplicate photos did not create a "system of records" containing information about the inmates that was then retrieved by personal identifiers giving rise to Privacy Act protections. 5 U.S.C. §§ 552a(a)(5), 552a(e). The "system of records" issue was remanded by this court for further consideration by the District Court following appellants' last appeal. *Maydak v. United States* ("*Maydak I*"), 363 F.3d 512 (D.C. Cir. 2004).

Following proceedings on remand of the case, the District Court granted summary judgments in favor of the Government. *Maydak v. United States*, No. 1:97-cv-02199 (D.D.C. Mar. 30, 2006) ("*Maydak II*"), *reprinted in* App. to the Opening Br. of Appointed Amicus Curiae in Supp. of Appellants ("App.") 319-31; *Maydak v. United States*, No. 1:97-cv-02199, 2007 WL 1018469 (D.D.C. Mar. 30, 2007) ("*Maydak III*"); *Maydak v. United States*, No. 1:97-cv-02199, 2007 WL 2381388 (D.D.C. Aug. 20, 2007) ("*Maydak IV*"). The District Court concluded that BOP had satisfactorily reimbursed the Trust Fund for any misappropriations. The trial court also rejected appellants' request for nationwide discovery, holding that further discovery was unnecessary. *Maydak III*, 2007 WL 1018469 at *1; *Maydak IV*, 2007 WL 2381388 at *1. In addressing the Privacy Act claims, the District Court held that prison officials' searches through boxes of unsorted photos in the hopes of recognizing an inmate did not constitute a "system of records" within the compass of the Act. *Maydak II*, slip op. at 4, App. 322. The District Court additionally held that, even if the disputed photo searches were covered by the Privacy Act, appellants' claims lacked merit because the appellants had proffered no evidence

that would allow a reasonable juror to find that BOP acted willfully or intentionally to violate their rights under the Act. *Id*. at 6-8, App. 324-26. Appellants, with the able support of appointed amicus curiae, the Georgetown University Law Center Appellate Litigation Clinic, now seek reversal of the District Court's judgments.

We vacate the District Court's judgment on the Trust Fund claims. All three appellants have been released from incarceration, so their claims are now moot. And it is clear that appellants no longer have standing to challenge the management of the Trust.

We affirm the District Court's grant of summary judgment for the Government on the Privacy Act claims. Even assuming that BOP's review and retention of duplicate photos created a "system of records" triggering Privacy Act protections, civil remedies are only available if appellants can show "that the agency acted in a manner which was intentional or willful." 5 U.S.C. § 552a(g)(4). At summary judgment, the Government presented affidavits declaring that BOP officials did not intentionally or willfully commit Privacy Act violations and that the duplicate photos were used solely in furtherance of legitimate law enforcement interests. In response, appellants proffered no evidence and thus failed to establish a genuine issue for trial regarding the intent and willfulness of Government officials. In these circumstances, the District Court was obliged to grant summary judgment for the Government.

## I. BACKGROUND

### A. *The Inmate Trust Fund and the Inmate Photography Program*

Each BOP correctional institution maintains a Commissary, which is charged with two purposes: (1) maintenance of inmates' monies through the Inmate Deposit Fund; and (2) provision of merchandise and services that are not generally

supplied by the institution. BOP Program Statement No. 4500.07 (Apr. 19, 2010) ("Program Statement 4500.07") ¶ 2.1(a). Each Commissary maintains a store where inmates are able to purchase items such as snack foods, personal hygiene products, and postage stamps, with all sales proceeds being deposited into the Inmate Trust Fund. The United States Government serves as the trustee for the Trust Fund and, pursuant to 31 U.S.C. § 1321(b)(1), is obliged to ensure that "disburse[ments are made] in compliance with the terms of the trust." It is undisputed that "trust funds may [only] be used for any purpose accruing to the benefit of the inmate body, as a whole, such as amusements, education, library, or general welfare work." *Maydak I*, 363 F.3d at 521 (quoting *Washington v. Reno*, 35 F.3d 1093, 1096 (6th Cir. 1994)) (internal quotation marks omitted); *see also* Program Statement 4500.07 ¶ 2.3(d). "The inmates at federal correctional facilities throughout the country are . . . the sole beneficiaries of the trust," *Washington*, 35 F.3d at 1104, and as a result, "[s]ecurity-related items," such as radios, fences, or razor wire, are prohibited uses of Trust Fund profits. Program Statement 4500.07 ¶ 2.3(d)(3).

One of the services supported by the Trust Fund is the inmate photo program, pursuant to which inmates are allowed to have personal pictures taken, either alone or with visitors, at the cost of $1.00 per photo voucher. *Id.* ¶ 5.4. Trust Fund monies are used to cover all operational costs of the program, including camera equipment, photo processing, and photographer salaries. *Id.* Until recently, officials at many BOP correctional facilities accepted duplicate prints from the photo developers, sometimes in connection with a complimentary promotion and sometimes for an additional nominal fee. *Maydak I*, 363 F.3d at 522. The duplicate photo prints often were reviewed by BOP officials, variously, to uncover visual signs of gang-related activity, obscenity, or potential threats to the institution's safety or security. *Id.* at 514. Photos marked as problematic were added to existing security files or scanned into

electronic files. Unused photo duplicates were either given to the inmates, immediately destroyed, or retained for a short period of time and then discarded. *Id.*

On April 19, 2010, BOP updated its Trust Fund Manual to officially forbid individual institutions from accepting duplicate prints, even if provided for free. *Compare* BOP Program Statement No. 4500.07 ¶ 5.4 ("Institutions shall not accept double prints from the vendor.") *with* BOP Program Statement No. 4500.06 (Feb. 19, 2009) ¶ 5.4(b)(2) ("Duplicate prints may be offered if there is no increase in cost."), *reprinted in* Addendum to Br. for Appellees.

## B. Litigation History

In 1997, appellant Paul Lee realized that several BOP institutions were ordering double prints but only releasing a single print to the inmate. *See Maydak I*, 363 F.3d at 514-15 (discussing much of the case's factual history). Lee, along with two of his fellow inmates – appellant Keith Maydak and Ambrose Mitchell, the latter of whom was eventually replaced in this litigation by appellant Gregory Smith – filed a complaint in the District Court. Am. Compl., *reprinted in* App. 32-71. The litigation has since focused on the photo retention and review practices at seven different federal correctional institutions ("FCI") in which the appellants were held – namely, McKean, Ray Brook, Beckley, Lewisburg, Oklahoma City, Cumberland, and Allenwood.

Appellants have alleged that BOP's undisclosed review and retention of the duplicate photos violated various provisions of the Privacy Act – including, for example, the requirement that information about a "system of records" must be disclosed to the public through publication in the Federal Register, 5 U.S.C. § 552a(e)(4), and the requirement that agencies must "establish rules of conduct for persons involved in the design, development, operation, or maintenance of any system of

records," § 552a(e)(9). Appellants also alleged that BOP improperly used duplicate photos for prison security purposes in violation of the terms of the Trust Fund and sought reimbursements to the Fund under 31 U.S.C. § 1321(b)(1) for these improper uses.

The District Court initially dismissed the complaint in its entirety, finding the Trust Fund claims unfounded and the photograph files exempt from the Privacy Act's requirements because of the statute's exception for information that is compiled for law enforcement purposes. *Maydak v. United States*, No. 1:97-cv-02199, slip op. at 2 (D.D.C. Mar. 31, 1999) (citing 5 U.S.C. § 552a(j)(2)). On appeal, this court vacated the dismissal of the Privacy Act and Trust Fund claims. *Maydak v. United States*, No. 99-5187, 1999 WL 1006593, at *1 (D.C. Cir. Oct. 27, 1999). We held that the law enforcement exception did not apply unless BOP had previously promulgated a regulation invoking the exemption. We also held that, even if a law enforcement exemption was properly sought, public disclosure in the Federal Register would still be required. Accordingly, the case was remanded for the District Court to determine whether the retained photographs constituted a "system of records" as necessary to trigger the Privacy Act requirements and to inquire further into the Trust Fund claims. *Id.*

Following remand, the Government initiated summary judgment proceedings. BOP officials acknowledged that duplicate prints were retained and occasionally reviewed for signs of gang-related activities, offensive gestures or conduct, and investigative or informational purposes. *Maydak v. United States*, No. 1:97-cv-02199, slip op. at 7 (D.D.C. May 4, 2001), *reprinted in* App. 210. The Government maintained, however, and the District Court agreed, that these practices did not produce a "system of records" as defined by the Privacy Act, because the photos were never organized by any personal identifiers. *Id.* at 7-9, App. 210-12; *Maydak v. United States*,

No. 1:97-cv-02199, slip op. at 1-2 (D.D.C. Mar. 22, 2002), *reprinted in* App. 218-19. The Government also argued, and the District Court again agreed, that 31 U.S.C. § 1321 violations only occurred where Trust Fund monies were used to pay for duplicates and that reimbursements were not necessary where the duplicate prints were provided by the vendor for free. In those institutions where BOP acknowledged misusing funds to cover the additional cost of duplicate prints, the District Court found reimbursements of those additional costs sufficient and concluded that further nationwide discovery of additional misappropriations was not warranted. *Maydak v. United States*, No. 1:97-cv-02199, slip op. at 2-4 (D.D.C. Mar. 22, 2002), App. 219-21. The District Court thus granted the Government's summary judgment motion on all counts.

The appellants appealed, and this court again vacated the judgment below. *Maydak I*, 363 F.3d at 512. In *Maydak I*, this court suggested strongly that the BOP photo review and retention practices might constitute a "system of records," although we ultimately remanded the issue for consideration by the District Court in the first instance. The relevant portion of *Maydak I* says:

> [W]e believe that a genuine issue of material fact remains as to whether BOP's photo file in fact constitutes a system of records. Recall that a system of records is "a group of any records . . . from which information is retrieved by the name of the individual or by some identifying number, symbol, or *other identifying particular assigned to the individual*." 5 U.S.C. § 552a(a)(5) (emphasis added). The term "record" includes "any item . . . about an individual . . . that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print *or a photograph*." Id. § 552a(a)(4) (emphasis added). Under the Act's plain language, then, a "system of records" may be a group of

any records retrieved by an identifying particular such as a photograph. In other words, the personal identifier may be the photograph itself.

In asserting that the prisons at issue here maintained no such system of records, BOP officials failed to appreciate this point. They assumed that because the photographs were organized neither by name nor individually assigned number, they were not organized by personal identifier. For instance, the McKean [Special Investigative Supervisor ("SIS")] declared that duplicate photos with "investigative or informative value" were retained in investigation case files and other duplicates were "stored in a box for approximately six (6) months and then destroyed." Roy Decl. ¶ 9. Yet the SIS also claimed that "[n]one of the photographs . . . reviewed by the SIS office . . . [were] retrievable by an individual inmate as they [were] not filed by any personal identifier." *Id*. ¶ 10. As amicus quite properly asks, "What purpose would it serve to keep photographs that BOP investigators have purportedly determined have some significant importance to the security of the institution in a filing system from which they could not be retrieved by individual?" Amicus Br. at 12 n.4. "Presumably," amicus points out, "one of the primary reasons for keeping such a system is to enable the SIS to track and prevent unlawful activities by individuals whose photographs provide valuable information to do that." *Id*. Nor is it clear from the record why McKean officials retained for six months duplicate photographs having no investigative value. Although practices vary by prison, the Ray Brook declaration, which is very similar to the McKean declaration, suggests one such purpose: "to identify possible associates or accomplices of an inmate suspected of, or charged with, committing prohibited acts at FCI Ray Brook." Cross Decl. ¶ 9. This indicates that the duplicate photographs stored in a box were retrievable by

personal identifier – the photograph itself – for how else could SIS staff have identified a particular inmate's associates or accomplices if not by the photograph?

The government argues that even if the photographs were *retrievable* by personal identifier, the photograph file would not constitute a system of records if the photos were not actually *retrieved* by personal identifier. The government is correct. In *Henke* [*v. United States Department of Commerce*, 83 F.3d 1453 (D.C. Cir. 1996)], we held that "retrieval capability is not sufficient to create a system of records"; the agency must in practice retrieve information by personal identifier. [*Id.*] at 1460-61. Although incidental or ad hoc retrieval by personal identifier does not convert a group of records into a system of records, where an agency compiles information about individuals for investigatory purposes, "Privacy Act concerns are at their zenith, and if there is evidence of even a few retrievals of information keyed to [personal identifiers], it may well be the case that the agency is maintaining a system of records." *Id.* at 1461.

On the record before us, it seems clear that at least one institution, Ray Brook, retrieved photographs by personal identifier. With respect to the other institutions, because the declarations rested on a flawed understanding of personal identifier, they cannot support the grant of summary judgment. We will thus remand for the district court to determine whether the prisons' compilation of photos constitutes a system of records. In considering this issue, the district court should take into account "the entirety of the situation, including the agency's function, the purpose for which the information was gathered, and the agency's actual retrieval practices and policies." *Id.*

*Maydak I*, 363 F.3d at 519-20 (ellipses and third, fourth, fifth, and eighth brackets in original).

As for the Trust Fund claims, we concluded in *Maydak I* that reimbursements should not be confined to those institutions where duplicate prints required an additional fee; we also rejected as speculative the District Court's unverified determination that other BOP institutions were not misappropriating Trust Fund monies. *Id.* at 521-22.

On remand, the District Court again found that BOP's retention of duplicate photos within boxes or computer files did not constitute a system of records. On this point, the District Court declared:

> Searching through a box or collection of unidentified photos with the hope of recognizing an inmate does not fit the definition [of a system of records] because the photos are not "retrieved" by any "assigned" personal identifier. In the absence of "evidence of even a few retrievals of information keyed to individuals" names [or some other personal identifier], the Court finds no genuine issue of material fact existing as to whether the duplicate photos retrieved in the manner described above constitute a BOP system of records.

*Maydak II*, slip op. at 4 (last alteration in original) (citation omitted) (quoting *Henke*, 83 F.3d at 1461), App. 322. The District Court noted, however, that even if a system of records had been created, no damages would be due because "[n]o reasonable juror could find that BOP acted willfully or intentionally if it reasonably believed that it was not creating a system of records triggering Privacy Act's [sic] requirements." *Id.* at 7, App. 325. In other words, according to the District Court, BOP officials could not have intentionally violated the Privacy Act if they never believed that their actions rose to the level of Privacy Act violations. In two subsequent decisions, the District Court dismissed appellants' Trust Fund claims. In doing so, the trial court (1) rejected appellants' request for nationwide discovery of additional misappropriations as unnecessary due to

"the independent nature of these programs, and the absence of class action certification"; and (2) upheld BOP's additional reimbursements of "50 percent of the total cost of the original photos" as sufficient to reimburse the Trust Fund and cure the prior misdeeds of Government officials in their handling of Trust Fund monies. *Maydak III*, 2007 WL 1018469, at *1; *Maydak IV*, 2007 WL 2381388, at *1.

Before this court, appellants seek reversal of the District Court's grants of summary judgment to the Government on their Trust Fund and Privacy Act claims, dismissal of their motion for additional discovery, denial of their motion to supplement the complaint, and denial of their motion to join the Trust Fund as a party and to have a receiver and counsel appointed for the Fund. Professor Steven H. Goldblatt and the Georgetown University Law Center Appellate Litigation Clinic were appointed by this court as amicus curiae to brief and argue the case in support of appellants on appeal.

## II. ANALYSIS

### A. *Standard of Review*

We review the grant of summary judgment *de novo*, applying the same standard of review as that of the District Court. *Estate of Coll-Monge v. Inner Peace Movement*, 524 F.3d 1341, 1346 (D.C. Cir. 2008). Summary judgment is appropriate only where there is "no genuine issue as to any material fact" and, viewing the evidence in the light most favorable to the nonmoving party, "the moving party is entitled to a judgment as a matter of law." *McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006) (quoting FED. R. CIV. P. 56©).

### B. *Trust Fund Claims*

When this lawsuit was filed, appellants were able to pursue their Trust Fund claims under 31 U.S.C. §1321 because they were federal inmates and beneficiaries of the Trust Fund. At all

times during the litigation before the District Court, at least one of the named appellants remained in BOP custody. However, all three appellants have since been released from incarceration. Appellant Keith Maydak was released from BOP custody in 2005; appellant Gregory Smith was released in November 2009; and appellant Paul Lee was released in April 2010. We must, therefore, first address whether this court still retains jurisdiction over the Trust Fund claims.

The problem here is that appellants' claims against the Trust Fund were rendered moot once they left prison. Under trust law, claims for redress of a prior breach of trust can only be pursued by beneficiaries of the trust. *See, e.g.*, RESTATEMENT (SECOND) OF TRUSTS §§ 199-200 (1959). Since federal prison inmates are the sole beneficiaries of the Trust Fund, a claim for reimbursements to the Fund can only be pursued by a current federal inmate. All three appellants have been released from incarceration. As a result of their changed circumstances, their Trust Fund claims are now moot. *See Weinstein v. Bradford*, 423 U.S. 147 (1975) (per curiam) (parole applicant's challenge to parole board procedures moot once he gained complete release); *DeFunis v. Odegaard*, 416 U.S. 312 (1974) (per curiam) (law student's challenge to school's affirmative action program moot due to his pending graduation); *Flynt v. Weinberger*, 762 F.2d 134 (D.C. Cir. 1985) (per curiam) (publisher's suit challenging ban of press coverage of invasion of Grenada rendered moot when press ban was lifted two days after complaint was filed).

There is no exception to an application of the mootness doctrine in this case, for the matter is not "capable of repetition, yet evading review." The Court's decision in *Bradford* is instructive. In that case, Bradford sued members of the North Carolina Board of Parole, claiming that they were obligated to accord him certain procedural rights in considering his eligibility for parole. The district court refused to certify the

case as a class action and dismissed the complaint. By the time the case reached the Supreme Court, Bradford's temporary parole had ripened into a complete release from supervision. The Court noted that, "[f]rom that date forward it [was] plain that [Bradford had] no interest whatever in the procedures followed by [the Board of Parole] in granting parole." 423 U.S. at 148. Bradford argued that his case should not be dismissed as moot, because it fit within the "capable of repetition, yet evading review" exception to mootness. The Court rejected this argument, saying:

> [I]n the absence of a class action, the "capable of repetition, yet evading review" doctrine [is] limited to the situation where two elements combine[]: (1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again. The instant case, not a class action, clearly does not satisfy the latter element. While [the members of the Board of Parole] will continue to administer the North Carolina parole system with respect to those who at any given moment are subject to their jurisdiction, there is no demonstrated probability that [Bradford] will again be among that number.

*Id*. at 149.

The same principles apply here with respect to appellants' Trust Fund claims. The live dispute between the appellants and the Government ended when appellants were no longer in the custody of BOP.

Appellants seek to avoid this result by suggesting that, notwithstanding their release from prison, they continue to have standing to pursue their Trust Fund claims. In advancing this position, appellants rely primarily on the Court's decision in

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000).

> In *Friends of the Earth*, the plaintiffs sued under the citizen suit provisions of the Clean Water Act to enjoin the defendant's violation of the statute and to require the defendant to pay a civil penalty to the government. The district court determined that injunctive relief was inappropriate, because the defendant's violations of the statute had ceased after litigation commenced. However, the court assessed a civil penalty against the defendant to forestall future violations. The court of appeals reversed the imposition of the fine, holding that the case was moot once the defendant fully complied with the terms of the statute. It reasoned that all elements of Article III standing must exist throughout litigation and that the only remedy available after the defendant's violations had ceased – civil penalties payable to the government – did not redress any injury to the plaintiff. The Supreme Court reversed, holding that "the Court of Appeals confused mootness with standing." *Id*. at 189.

> . . . .

> The *Friends of the Earth* opinion follows easily from earlier decisions holding that if a plaintiff challenges both a specific action and the policy that underlies that action, the challenge to the policy is not necessarily mooted merely because the challenge to the particular action is moot. For example, in *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115 (1974), employers sought declaratory and injunctive relief to prevent New Jersey from granting state welfare benefits to striking workers on the ground that the state's actions violated federal labor law. The Court held that because the strike that prompted the suit ended before the case was resolved, the employer's request for an injunction preventing payment of welfare benefits during

the strike was moot. However, the Court also held that the employer's request for declaratory relief was not moot, because the challenged governmental action had not ceased and the employer's relationship with the union would be continually affected by the "fixed and definite" state policy of giving welfare benefits to strikers. *Id.* at 122–24.

HARRY T. EDWARDS & LINDA A. ELLIOTT, FEDERAL STANDARDS OF REVIEW–REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS 115-16 (2007).

*Friends of the Earth* and *Super Tire* plainly are inapposite here. Even though the plaintiffs' claims for declaratory relief in *Friends of the Earth* and injunctive relief in *Super Tire* were rendered moot during the course of litigation, the plaintiffs in those cases continued to have sufficient interests and the necessary standing going forward to pursue their claims for civil penalties and declaratory relief, respectively. The appellants in this case have no such continuing interests or standing.

Two decisions issued by the Supreme Court are illustrative in highlighting the problem that appellants face in this case. The first is the Court's recent decision in *Summers v. Earth Island Institute*, 129 S. Ct. 1142 (2009). In that case, the plaintiffs were several environmental protection organizations. When the lawsuit was filed in 2003, the plaintiffs challenged the United States Forest Service's failure to apply its usual notice-and-comment procedures to the approval of the so-called "Burnt Ridge Project." The plaintiffs also challenged the underlying federal Forest Service regulation exempting certain federal land sales from the notice-and-comment requirement generally applied to significant land management decisions. After the District Court issued a preliminary injunction, the parties settled their dispute over the Burnt Ridge Project. The plaintiffs then sought to continue pursuit of their challenge to the agency's regulation. The Court held that the plaintiffs had no standing to pursue this claim, because a party who sues to

challenge a certain action but then settles the claim does not "retain[] standing to challenge the basis for that action (here, the regulation in the abstract), apart from any concrete application that threatens imminent harm to his interests." *Id*. at 1150.

The second case worth noting is the Court's decision in *DeFunis v. Odegaard*, 416 U.S. 312 (1974) (per curiam). In that case, a prospective law student brought suit against the University of Washington Law School, seeking an injunction granting him admission and challenging the school's affirmative action policy that allegedly prevented his admission. The district court granted the preliminary injunction and DeFunis enrolled in law school. By the time the case reached the Supreme Court, however, DeFunis had already entered his last year of law school and was about to graduate. *Id.* at 315. The Supreme Court found that his claim for injunctive relief had been mooted by his impending graduation, and that, as a result, he no longer had a personal interest sufficient to support standing to challenge the underlying admissions policy. *Id.* at 319-20.

When the complaint in the instant case was filed, the appellants were federal prison inmates and, as such, had a clear and concrete personal interest in the management of the Trust Fund. Appellants' claims alleged an actual injury – namely, decreased inmate benefits due to the diminished resources of the Trust Fund – that was caused by BOP's improper use of Trust Fund monies and that could be redressed by BOP's reimbursement of the misappropriated funds. Standing was clear. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (explaining the essential requirements of injury, causation, and redressability necessary to support Article III standing). Following appellants' release from BOP custody, however, they were no longer beneficiaries of the Trust Fund and, therefore, held no continuing personal interest in future disbursements from the Fund. Their Trust Fund claims are thus

moot, and they have no standing to pursue the matter further. *Summers* and *DeFunis* are controlling.

During oral argument before this court, Amici maintained that appellants retained standing based on some individual *de minimis* claims for photo voucher reimbursements and overpayments caused by BOP's misuse of the Trust Fund monies. These claims come too late and are thus forfeited. *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1043 (D.C. Cir. 2003) ("The general presumption against deciding claims not raised below is particularly strong where, as here, the claim turns upon factual questions not yet passed upon by the district court."). Neither the appellants' amended complaint nor their motion to further amend their complaint raise these *de minimis* claims, a fact Amici effectively conceded in its reply brief to this court. *See* Reply Br. of Appointed Amicus Curiae in Supp. of Appellants at 20 (urging remand "so that plaintiffs can file an amended complaint seeking individual reimbursement"). In fact, appellants only mentioned these *de minimis* claims in the District Court in connection with "out-of-pocket expenses" for Privacy Act damages relief, not as grounds for individual standing on Trust Fund claims. *See* Pls.' Memo. in Opp. to the Defs.' Mot. for Summ. J. 9, 15-16, *reprinted in* App. 286, 292-93.

Since appellants no longer have standing to pursue their Trust Fund claims, we need not address the questions of whether the District Court abused its discretion in denying appellants' request for nationwide discovery; motion for leave to file supplemental pleadings identifying additional instances of Fund misuse; and motion to join the Trust Fund as a plaintiff, appoint a receiver for the Trust Fund, and appoint counsel for the Trust Fund.

\* \* \* \*

Where, as here, a claim cannot be reviewed on appeal due to mootness or a lack of standing, we typically vacate the District Court's judgment on the merits and remand with instructions to dismiss. *See, e.g.*, *Taylor v. FDIC*, 132 F.3d 753, 767 (D.C. Cir. 1997) (vacating summary judgment where appellant failed to show causation necessary for Article III standing); *Humane Soc'y of U.S. v. Babbitt*, 46 F.3d 93, 95 (D.C. Cir. 1995) (vacating and remanding with instructions to dismiss the case for want of jurisdiction upon finding that appellants lacked constitutional standing); *Flynt*, 762 F.2d at 135-36 (vacating judgment of trial court after case became moot). This "clears the path for future relitigation of the issues . . . and eliminates a judgment, review of which was prevented through happenstance." *Ramallo v. Reno*, 114 F.3d 1210, 1214 (D.C. Cir. 1997) (quoting *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950) (vacating case that has become moot)).

## C. Privacy Act Claims

### 1. Introduction: The Conjunction Between the Requirements of 5 U.S.C. § 552a(e) Relating to a "System of Records" and the Statutory Elements of "Intentional or Willful" and "Adverse Effects"

Under the Privacy Act, the Government may be liable for civil damages if a federal agency "fails to comply with any . . . provision of [the statute] . . . in such a way as to have an adverse effect on an individual." 5 U.S.C. § 552a(g)(1)(D). Plaintiffs seeking relief must establish that (1) the agency violated a provision of the Act, (2) the violation was "intentional or willful," 5 U.S.C. § 552a(g)(4), and (3) the violation had an "adverse effect" on the plaintiff, 5 U.S.C. § 552a(g)(1)(D). On the record before us, the second statutory element – relating to intent and willfulness – is dispositive of the appellants' Privacy Act claims.

As noted above, the extensive statutory requirements of section 552a(e) of the Act come into play only with respect to information that is maintained in a "system of records." 5 U.S.C. § 552a(e) ("Each agency that maintains a system of records shall . . . ."). A main point of dispute in this litigation has been whether BOP's photo review and retention practices constituted a "system of records" such that the protections of section 552a(e) applied. As defined by the statute, a system of records is "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). A system of records exists only if the information contained within the body of material is both "*retrievable* by personal identifier" and "actually *retrieved* by personal identifier." *Maydak I*, 363 F.3d at 520 (emphasis in original); *see also Henke*, 83 F.3d at 1460 ("[R]etrieval capability is not sufficient to create a system of records.").

There is clear tension between this court's decision in *Maydak I*, *see* 363 F.3d at 519-20, and the District Court's decision in *Maydak II*, *see* slip op. at 4, App. 320-22, regarding whether the BOP photo review and retention practices constituted a "system of records." Although we did not definitively resolve the matter, this court was of the view that "a 'system of records' may be a group of any records retrieved by an identifying particular such as a photograph. In other words, the personal identifier may be the photograph itself." *Maydak I*, 363 F.3d at 519. The District Court had a different view, concluding that "[s]earching through a box or collection of unidentified photos with the hope of recognizing an inmate does not fit the definition [of a system of records] because the photos are not 'retrieved' by any 'assigned' personal identifier." *Maydak II*, *see* slip op. at 4, App. 322.

The Government apparently has changed its policies regarding the review and retention of duplicate photos. *See* BOP Program Statement No. 4500.07 ¶ 5.4 ("Institutions shall not accept double prints from the vendor."). And in this appeal, the Government does not attempt to defend the District Court's judgment regarding the "system of records" issue. Rather, the Government's principal argument before this court is that

> the District Court correctly held that Appellants failed to present evidence that BOP acted "intentionally and willfully" as required by the Privacy Act to sustain a claim for damages, which is the only Privacy Act claim advanced by Appellants. There is no evidence that "anyone" in the shoes of the BOP officials would have found retention of duplicate photos an "egregious" violation of the Privacy Act, and BOP's evidence falls squarely within this Court's consistent Privacy Act precedents finding insufficient evidence of intent.
>
> . . . .
>
> If the agency was ultimately incorrect in its assessment that its retention of the photos constituted a system of records, that adds nothing to the intent analysis in this case because the question has remained open through several rounds of litigation, including a favorable decision by the District Court. And it should go without serious dispute that the final outcome of this issue should not control the intent analysis.
>
> If the Court agrees that Appellants failed to demonstrate a triable issue of fact regarding intent, all of their Privacy Act claims fail and it is unnecessary to address other issues regarding the Privacy Act.

Br. for Appellees at 4, 17.

Given the present posture of the case, we will simply assume, without deciding, that BOP's review and retention of the duplicate photos constituted a "system of records" under the Privacy Act. Our analysis will focus on whether Government officials acted intentionally or willfully to violate appellants' rights under the Act. For the reasons indicated below, we agree with the Government that appellants failed to proffer evidence sufficient to create a triable issue of fact regarding intent or willfulness. Therefore, it is unnecessary for us to determine whether the alleged statutory violations had an adverse effect on appellants. It is also unnecessary for us to address the Government's argument that "[a]ppellants' Privacy Act claims fail for the independent reason that they made no showing of . . . 'actual damages,' as required by the Privacy Act, 5 U.S.C. § 552a(g)(4)(A) . . . and the Supreme Court's decision in *Doe v. Chao*, 540 U.S. 614 (2004)." Appellee's Br. at 22.

### 2. The "Intentional or Willful" Issue

Section 552a(g)(4) of the Privacy Act provides:

(4) In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of –

(A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and

(B) the costs of the action together with reasonable attorney fees as determined by the court.

Pursuant to this provision, it is clear that "[t]he [Privacy] Act does not make the Government strictly liable for every affirmative or negligent action that might be said technically to

violate the Privacy Act's provisions." *Albright v. United States*, 732 F.2d 181, 189 (D.C. Cir. 1984). Rather, under the case law construing and applying section 552a(g)(4), we have held that a violation of the statute "must be so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) (quoting *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (per curiam) (internal quotation marks omitted). "Intentional or willful" means: "somewhat greater than gross negligence, or, an act committed *without grounds for believing it to be lawful*, or by flagrantly disregarding others' rights under the Act." *Waters v. Thornburgh*, 888 F.2d 870, 875 (D.C. Cir. 1989) (emphasis added) (internal quotation marks and citations omitted), *abrogated on other grounds by Doe v. Chao*, 540 U.S. 614 (2004).

The decision in *Albright* is illustrative of the burden of proof that claimants must meet in order to satisfy the "intentional or willful" element of the Privacy Act. *Albright* involved a case in which analysts at the Social Security Administration sought redress under the Privacy Act on the grounds that agency officials impermissibly videotaped an informational meeting attended by analysts to discuss a management decision to downgrade their civil service classification. The District Court concluded that the agency's action did not give rise to damages under the Privacy Act because there was no evidence that agency officials acted intentionally or willfully to violate appellants' rights. *Albright*, 732 F.2d at 183. We affirmed.

In construing § 552a(g)(4), *Albright* held that:

The terms "intentional" and "willful" must be interpreted in their context to determine their meaning. Under Section 552a(g)(1)(D) liability is predicated on an agency's "failure to comply" with the Privacy Act. Thus, the "intentional or willful" action requirement of Section 552a(g)(4) refers only

> to the intentional or willful failure of the agency to abide by the Act, and not to all voluntary actions which might otherwise inadvertently contravene one of the Act's strictures. Section 552a(g)(4) imposes liability only when the agency acts in violation of the Act in a willful or intentional manner, either by committing the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act.

*Id.* at 189 (footnotes omitted). During proceedings before the District Court in *Albright*, the agency presented unrefuted evidence establishing that the idea of a videotape originated from an employee who had to miss the meeting, that the principal purpose of the tape was to enable the agency to provide a "full record of the events of the meeting" to absent employees, and that the agency had offered to destroy the videotape. *Id.* at 189-90. The court found that, under the applicable legal standard, this evidence demonstrated that the agency acted with a legitimate and lawful purpose and not pursuant to a proscribed intention of infringing upon the employees' Privacy Act rights. *Id.* at 185. The appellants in *Albright* offered no affirmative evidence of their own, but merely "claim[ed] that [trial witness] testimony *could* have established other motives for the videotaping." *Id.* at 190 (emphasis added). We concluded that "speculation on appeal about the possible content of . . . testimony cannot rectify the plaintiffs' failure to meet their burden of proof on this critical element of the case" and found dismissal of the Privacy Act claims justified. *Id*.

Unlike *Albright*, the proceedings before the District Court in this case involved a summary judgment, not a trial. Nonetheless, the controlling legal standards are the same. In order to survive the Government's motion for summary judgment on the "intentional or willful" issue, the appellants were required to proffer evidence that the Government's actions were:

- so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful, or

- somewhat greater than gross negligence, or

- committed without grounds for believing them to be lawful, or

- in flagrant disregard of others' rights under the Act.

Plaintiffs who oppose summary judgment on the intent issue cannot prevail by merely presenting evidence that "the government acted negligently, or that the government handled a matter in a disjointed, or confused manner, or that the government acted inadvertently to contravene the Act." *Waters*, 888 F.2d at 875-76 (citations, quotation marks, and brackets omitted). Appellants in this case did not come close to satisfying these standards in their submissions to the District Court.

Under Rule 56(c) of the Federal Rules of Civil Procedure,

summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to

make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In this case, the Government supported its motion for summary judgment with affidavits explaining the motives and purposes of the BOP officials who engaged in the disputed photo review and retention practices. *See, e.g.*, Williams Decl. ¶ 6, *reprinted in* App. 360-61. We agree with the Government that the evidence proffered on behalf of BOP demonstrated that the agency "had both a legitimate purpose in retaining the photos and their practice of retention was perfectly consistent with its stated purpose." Br. for Appellees at 12. We do not mean to say that the photo review and retention practices were consistent with the requirements of the Privacy Act, but we do find that the Government's evidence clearly supports its claim that the practices were not impermissibly "intentional or willful."

In response to the Government's motion for summary judgment, the appellants offered nothing of substance to counter the Government's evidence. Rather, appellants merely argued that BOP officials *must* have known that they were violating the Privacy Act because the controversial and long-running litigation put them on clear notice of this issue, and wrongful intent could be inferred from the agency's continued retention of duplicate photos. *See* Pls.' Memo. in Opp. to the Defs.' Mot. for Summ. J. 11-15, *reprinted in* App. 288-92. This was far short of what is required by Rule 56 to defeat a motion for summary judgment.

It is true that "summary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 252. In this case, appellants simply did not produce what Rule 56 requires.

In summary judgment proceedings, "[i]f the burden of persuasion at trial would be on the non-moving party [here, the appellants], the party moving for summary judgment may satisfy Rule 56's burden of production [by (1) submitting] affirmative evidence that negates an essential element of the nonmoving party's claim [or (2)] demonstrat[ing] to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting). The Government satisfied both of these requirements. Rule 56 further requires that:

> Once the moving party has attacked whatever record evidence – if any – the nonmoving party purports to rely upon, the burden of production shifts to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f).

*Id*. at 332-33 n.3 (Brennan, J., dissenting). Appellants satisfied none of these requirements.

Appellants' arguments that BOP officials *must* have known that they were violating the Privacy Act, offered to suggest a triable issue of fact on the intent issue, simply cannot carry the day. First, it is uncontested that the photographs that were reviewed and retained by BOP officials were used only for legitimate law enforcement purposes, such as review for signs of gang-related activity. Second, given the complex statutory definition of a "system of records" and its focus on retrieval by an individual's name or "identifying number, symbol, or other identifying particular," 5 U.S.C. § 552a(a)(5), the retention of unsorted duplicates in a box for a period of months for legitimate law enforcement purposes is not "so patently egregious and

unlawful that anyone undertaking the conduct should have known it unlawful." *Sussman*, 494 F.3d at 1122 (quoting *Laningham*, 813 F.2d at 1242). Third, the Supreme Court has recognized that, although prisoners are not without constitutional rights, prison officials must have the ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. *See Jones v. N. C. Prisoners' Union*, 433 U.S. 119 (1977); *see also Thornburgh v. Abbott*, 490 U.S. 401 (1989) (regulations authorizing prison officials to screen and reject objectionable publications addressed to prisoners held to be facially valid); *Turner v. Safley*, 482 U.S. 78 (1987) (regulation of inmate-to-inmate correspondence held to be reasonably related to legitimate security concerns of prison officials). Because the "solutions to problems arising within correctional institutions [are] never [] simple or easy," *N. C. Prisoners' Union*, 433 U.S. at 137 (Burger, C.J., concurring), it is not surprising that BOP officials assumed that reviewing and retaining photographs served the interests of good prison administration. In this light, the disputed practice does not reveal an agency action committed "without grounds for believing it to be lawful." *Albright*, 732 F.2d at 189. Fourth, there is no evidence that BOP used the duplicate photos outside the prison setting, *see Tijerina v. Walters*, 821 F.2d 789 (D.C. Cir. 1987), or "flagrantly disregard[ed]" defendants' rights in any other way. *Albright*, 732 F.2d at 189. Finally, even after our remand of the case in *Maydak I*, BOP officials were still never placed on clear notice that their practices violated the Act. Notwithstanding this court's critical discussion of the review and retention policies at FCI Ray Brook, we did not resolve this issue; rather, we remanded the matter to the District Court "to determine whether the prisons' compilation of photos constitutes a system of records." *Maydak I*, 363 F.3d at 520. It is thus unsurprising that certain BOP facilities continued following established practices until the issue was definitively resolved. In fact, after the remand in *Maydak I*, the District Court agreed with

the Government's position and held that "[s]earching through a box or collection of unidentified photos with the hope of recognizing an inmate does not fit the definition [of a system of records] because the photos are not 'retrieved' by any 'assigned' personal identifier." *Maydak II*, slip op. at 4, App. 322. This gave further support to the Government that its practices were not unlawful.

As our case law makes clear, the Privacy Act's "intentional or willful" element cannot be satisfied with mere speculation, *Albright*, 732 F.2d at 190, which is all that appellants have offered in this case. The record in this case is plainly distinguishable from a case like *Waters* in which the court reversed the District Court's grant of summary judgment for the Government. In *Waters*, the plaintiff sued his employer, the Department of Justice ("DOJ"), to complain about a letter sent by DOJ to the Pennsylvania Board of Bar Examiners seeking confirmation that Waters had indeed sat for the bar exam. The plaintiff argued that DOJ violated the Privacy Act by failing to collect information "to the greatest extent practicable directly from the subject individual." 888 F.2d at 872 (quoting 5 U.S.C. § 552a(e)(2)). The District Court granted summary judgment to DOJ, persuaded by the agency's proffered evidence that its decision to contact the Pennsylvania Board was based on reasonable doubts as to Waters' veracity. *Id.* We reversed and remanded, finding that the derogatory tone and content of DOJ's letter and the Pennsylvania Board's refusal to respond without a written "demonstration of need for the information" raised a genuine issue of material fact regarding the agency's intent to act in violation of the Act. *Id.* at 875-77. Unlike the plaintiff in *Waters*, the appellants here failed to raise any triable issue of fact on intent.

At oral argument, Amici argued that even if appellants failed to proffer evidence in support of their claims that BOP officials acted "intentionally or willfully," the case should be remanded

because the District Court wrongly stayed discovery and thus prevented appellants from having an opportunity to gather the necessary evidence. This argument fails, for there is nothing in the record – and appellants point us to nothing – to indicate that appellants ever sought discovery on the question of whether BOP officials acted "intentionally or willfully." Even after the remand in *Maydak I*, which placed appellants on direct notice that intent would be a necessary element of their Privacy Act claims and that summary judgment would be appropriate if the Government were able to show that BOP did not act intentionally or willfully in violation of the Act, no discovery requests were directed at this question. *See Maydak I*, 363 F.3d at 521 ("[T]his issue [of BOP's intent] is a question of fact entirely undeveloped in the record . . . [and] it provides no basis for summary judgment *at this time*." (emphasis added)). Instead, appellants' post-*Maydak I* discovery requests focused solely on their Trust Fund claims. *See* Pls.' Mot. to Compel (Aug. 10, 2004) (appending discovery requests); Pls.' Opp. to Defs.' Protective Mot. for Enlargement of Time at 1 (Aug. 10, 2004) ("The Court of Appeals specifically remanded the trust fund claims with instructions to allow the plaintiffs discovery."). The District Court's refusal to allow further discovery on the Trust Fund issues cannot excuse appellants' failure to propound any discovery requests related to the Privacy Act's intent question. Therefore, appellants cannot now cite the lack of discovery as a ground to set aside the summary judgement issued in favor of the Government. We therefore affirm the District Court's grant of summary judgment to the Government on the "intentional or willful" issue.

## III. CONCLUSION

For the foregoing reasons, we affirm the District Court's judgment except where we vacate and remand with instructions to dismiss due to a lack of jurisdiction.