# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 13, 2012        Decided March 29, 2013

No. 09-5354

SEAN GERLICH, ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01134)

*Daniel J. Metcalfe* argued the cause and filed the briefs for appellants.

*Daniel Tenny*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Ronald C. Machen Jr.,* U.S. Attorney, and *Mark B. Stern* and *Michael S. Raab*, Attorneys. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: GARLAND, *Chief Judge*, ROGERS and GRIFFITH, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: "This case arises from a dark chapter in the United States Department of Justice's history.*" Gerlich, et al. v. U.S. Dep't of Justice*, 828 F. Supp. 2d 284, 286–87 (D.D.C. 2011). Appellants were three applicants for attorney positions under the Honors Program in 2006 who alleged that they were not selected for interviews because of their political affiliations. "The Privacy Act generally prohibits government agencies from maintaining records describing how an individual exercises First Amendment Rights." *Id.* at 287. Appellants claimed that senior officials at the Department of Justice nonetheless created such records in the form of annotations to appellants' applications and internet printouts concerning their political affiliations. They contend that the district court erred in dismissing some of their claims, granting summary judgment on the remaining claims, and denying their motion for class certification.

We hold that summary judgment was inappropriately granted on appellants' Privacy Act claims under 5 U.S.C. § 552a(e)(5) and (e)(7). In that regard, we conclude, in light of the destruction of appellants' records, that a permissive spoliation inference was warranted because the senior Department officials had a duty to preserve the annotated applications and internet printouts given that Department investigation and future litigation were reasonably foreseeable. On remand, the district court shall construe the evidence in light of this negative spoliation inference, which would permit a reasonable trier of fact to find that two of the appellants were harmed by creation and use of the destroyed records. Otherwise we affirm.

**I.**

In April 2007, an anonymous letter signed by "A Group of Concerned Department of Justice Employees" was sent to the

Chairmen of the U.S. House and U.S. Senate Judiciary Committees, alleging that Honors Program hiring had been politicized. Articles about the letter appeared in the *Wall Street Journal* and the *Washington Post*. In June 2008, the Department's Office of the Inspector General and Office of Professional Responsibility issued a report on their "joint investigation concerning whether the political or ideological affiliations of applicants were improperly considered in the selection of candidates for the Attorney General's Honors Program and the Summer Law Intern Program from 2002 to 2006." OFFICE OF THE INSPECTOR GENERAL AND OFFICE OF PROFESSIONAL RESPONSIBILITY, U.S. DEP'T OF JUSTICE, AN INVESTIGATION OF ALLEGATIONS OF POLITICIZED HIRING IN THE DEPARTMENT OF JUSTICE HONORS PROGRAM AND SUMMER LAW INTERN PROGRAM 1 (Jun. 24, 2008). The 2008 Report confirmed, as relevant, the following:

• The Honors Program is "the *exclusive* means by which the Department hires" all of its entry-level attorneys, including "recent law school graduates and judicial law clerks who do not have prior legal experience." *Id*. at 3 (emphasis added). Honors Program hiring affects the composition of the Department's corps of career attorneys, determining which recent law school graduates are selected to enter its ranks, in most instances with the opportunity to remain permanently. *Id*. The process "historically has been very competitive, with the Department receiving hundreds more applications than available positions." *Id.*

• In 2002, the Department changed its hiring procedures to reflect the recommendations of a Working Group of senior officials in the offices of the Attorney General, Deputy Attorney General, and Associate Attorney General. *Id*. at 4. In order to increase political appointee participation and attract more qualified applicants, the Department created a centralized

Honors Program Screening Committee, located in Washington, D.C., to review applicants selected by the various components for interviews. *Id.* at 4, 5. The new location allowed political appointees in leadership positions to be more involved in the selection process. *Id*. at 4–5. Additionally, the Office of Attorney Recruitment and Management ("Recruitment Management Office") created a centralized, automated process for submission of applications. *Id.* at 4. Some of these reforms sparked internal Department complaints in 2002, but it was not until 2006 that widespread criticism of the program emerged following the Screening Committee's decision to "deselect" an unusually high number of applicants whom the Department's components had already selected to travel to Washington, D.C. for interviews. *Id.* at 5.

• The 2006 Screening Committee was composed of two political appointees, Michael Elston, Chief of Staff and Counselor to the Deputy Attorney General, and Esther McDonald, Counsel to the Associate Attorney General. *Id.* at 75, 79. The third member, Daniel Fridman, was a career Assistant U.S. Attorney on detail to the Deputy Attorney General's Office. *Id.* at 69. For the screening process both McDonald and Fridman would review the applicants on the list of those chosen by the various Department components to decide whether to approve interviews of them. *Id.* at 72. This involved printing and marking paper versions of the applications submitted through the automated system. *Id*. at 68, 72. McDonald and Fridman forwarded these paper copies, any attachments, and their own recommendations to Elston, who would make the final decision as to whether the applicant would be interviewed. *Id.* at 81, 94. In 2006 the Screening Committee "deselected" 31 percent of the applicants forwarded by Department components, an enormous increase over the previous three years, when the "deselection" rate ranged between one and seven percent. *Id.* at 39–40.

• Both Elston and McDonald used ideological and political factors in "deselecting" applicants, *id*. at 81, 83, 99–100, while Fridman refused to use such "improper considerations," *id*. at 100. Specifically, McDonald looked for indications of an applicant's association with "liberal" organizations in the submitted application materials and also, in many instances, conducted internet searches on applicants to locate any other "leftist" ideological affiliations. *Id.* at 77. McDonald's ideological litmus test included what she referred to as "leftist commentary," like the use of the phrase "social justice" in an applicant's essay, membership in groups like the American Constitution Society, an organization intended to be a "'progressive' counterpart to the more conservative Federalist Society," *id.* at 78, or work history with "a judge, law professor, or legislator [McDonald] considered liberal." *Id.* at 93. Elston permitted McDonald to recommend "deselection" based on ideological affiliation, even after Fridman alerted him to these improprieties, and he gave "vague" instructions to Fridman to "deselect" "wackos" or individuals who did not have "views consistent with the Attorney General's views on law enforcement." *Id.* at 94.

• McDonald's internet background checks led to the creation of written notations and computer printouts containing information she viewed online. *Id.* at 73, 82. Fridman recalled seeing her written comment on a paper copy of an application stating that the applicant's law review article on detention at the U.S. naval base at Guantanamo Bay, Cuba, "was contrary to the position of the administration." *Id*. at 73. Another of McDonald's written comments indicated she had found information online that an applicant was an "anarchist." *Id*. Elston recalled seeing printouts from internet searches that McDonald had attached to applications and did not discourage her from seeking out and documenting applicant background information in this manner. *Id*. at 82.

• McDonald would recommend "deselection" of applicants based on ideological factors, some of which she discovered not from the applications themselves but from her own internet research, regardless of the applicant's qualifications. *Id*. at 73. Using Fridman's apolitical hiring criteria, the Report investigators developed an operational definition of "highly qualified candidates," *id*. at 42 — i.e., those who "either attended a top 20 law school, were ranked in the top 20 percent of the class, or attended a law school that did not rank candidates," and who did not have a grade lower than a B on their transcript. *Id*. at 43. For data analysis purposes, the investigators also defined "liberal" organizations as those that promote "choice in abortion issues, gay rights, defense of immigrants, separation of church and state, and privacy rights" and "conservative" organizations as those that promote "defense of religious liberty, traditional family values, free enterprise, limited government, and right to life issues." *Id*. at 19 n.18. When examined in light of these definitions, the applicant data for 2006 showed that the Screening Committee had "deselected" 40 percent of highly qualified applicants with liberal affiliations and only six percent of highly qualified applicants with conservative affiliations. *Id*. at 43.

• Elston and others responsible for the 2006 Honors Program hiring process were aware during and shortly after the time of the selection review that the "appearance of what McDonald was doing was problematic." *Id*. at 83 (quoting Elston) (internal alterations omitted). After a conversation with Fridman, the Associate Deputy Attorney General told the investigators that he had "understood that Fridman was concerned that Elston may have asked him to review candidates based on their political or ideological views," *id*. at 70, and had advised Elston of Fridman's concerns, *id*. at 70–71. On another occasion, the Assistant Attorney General of the Civil Division telephoned Elston after learning that he had rejected an appeal

of a "deselected" highly qualified applicant and told him "a lot of people . . . believe that these deselections are either irrational or so irrational that they are motivated by politics, and that's a problem you know . . . when this many people in a Department are this unhappy about something, it's going to be an issue." *Id*. at 48 (quotation marks omitted). After a December 5, 2006 meeting to discuss the "deselections" with Department components, a senior Tax Division attorney went to Elston's office and "told him that he and others were concerned that politics had played a role in the deselections." *Id*. at 62. Additionally, the director of the Recruitment Management Office acknowledged that during the 2006 "deselection" process "a few employees raised to him an 'implication' that the candidates were 'being deselected in these numbers because of political considerations.'" *Id*. at 59.

• Despite being aware that there were serious irregularities in the 2006 hiring process, the officials involved did not take steps to preserve documentation of how they made their decisions. Instead, Elston permitted all of the annotated paper copies of the applications and internet printouts to be destroyed in early 2007. *Id*. at 69. McDonald stated in reference to the destruction of records that Elston had told her that "at least that's one thing I did right." McDonald Dep. 262: 1-2, July 27, 2010.

• In April 2007, the Department replaced the Screening Committee with "an Ad Hoc Working Group of career officials from the major components participating in the Honors Program." *Id*. at 67.

On June 30, 2008, Sean Gerlich sued and filed, with others, amended complaints on August 15, 2008 and November 12, 2008, raising claims under the Privacy Act of 1974, the Civil Service Reform Act, the Federal Records Act, and the

Constitution.  They relied on the findings in the 2008 Report, and sought damages in addition to injunctive and declaratory relief.  The district court dismissed all claims against the individual defendants, and all except counts I and II of the second amended complaint, which alleged violations of the Privacy Act, 5 U.S.C. § 552a(e)(5) and (e)(7).  *See Gerlich v. Dep't of Justice*, 659 F. Supp. 2d 1, 20 (D.D.C. 2009). Following discovery, the court dismissed the Privacy Act claims under 5 U.S.C. § 552a(e)(1-2), (e)(6), and (e)(9-10) for lack of adequate pleading that the records at issue were part of a "system of records." *See id*. at 16–17.  It dismissed for lack of standing claims of plaintiffs who had "never reached the stage in the hiring process where the violations allegedly occurred," *id*. at 17–18, and it dismissed plaintiffs' constitutional claims under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), in light of the remedial scheme created by the Civil Service Reform Act, *see Gerlich*, 659 F. Supp. 2d at 12.  The  district court also denied, in the absence of a showing of excusable neglect, the untimely motion for certification of a class comprising all "deselected" applicants to the Honors Program in 2006, and denied reconsideration.

The remaining plaintiffs — Matthew J. Faiella, Daniel J. Herber, and James N. Saul — appellants here, moved on May 20, 2011, for summary judgment, as did the Department the following month.  On July 25, 2011, the plaintiffs filed a motion for a spoliation sanction, seeking an adverse inference supporting their claims based on the Department's destruction of the paper copies of their applications, which the Screening Committee used to make its evaluations and which McDonald annotated and supplemented with internet printout attachments. The district court ruled that the plaintiffs were not entitled to an adverse inference and granted summary judgment.  Although senior Department officials violated the Privacy Act as to at least "some" Honors Program applicants, in the absence of

evidence confirming McDonald had created records from her internet searches with regard to the plaintiffs, the district court concluded that there was no way of knowing whether their "deselection" was based on records created in violation of the Privacy Act or the information contained within the applications they themselves submitted. *See Gerlich*, 828 F. Supp. 2d at 304–305.

Appellants appeal. Our review of the dismissal of counts III-VII and the grant of summary judgement on counts I and II is *de novo. See Dixon v. District of Columbia*, 666 F.3d 1337, 1341 (D.C. Cir. 2011); *Sigmund v. Starwood Urban Retail VI, LLC*, 617 F.3d 512, 513 (D.C. Cir. 2010). We review the denial of a spoliation sanction for abuse of discretion, *see Shepherd v. Am. Broad. Co.*, 62 F.3d 1469, 1475 (D.C. Cir. 1995), as we do the denial of the motion for class certification, *see Garcia v. Johanns*, 444 F.3d 625, 631 (D.C. Cir. 2006); *In re Vitamins Antitrust Class Actions*, 327 F.3d 1207, 1209 (D.C. Cir. 2003). Appellants do not pursue their claims for injunctive and declaratory relief under the Civil Service Act, the Federal Records Act, and the Privacy Act; nor do they pursue their Constitutional claims.

## II.

In the Privacy Act, 5 U.S.C. § 552a, Congress addressed "the collection, maintenance, use, and dissemination of information by [federal] agencies" in order to "protect the privacy of individuals identified" in agency "information systems." Pub. L. No. 93-579 § 2(A)(5), 88 Stat. 1896 (1974). The Act "gives agencies detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements." *Doe v. Chao*, 540 U.S. 614, 618 (2004). Some of the Privacy Act's provisions regulate what an

agency can do with records maintained in its system of records while others regulate what an agency can do with any records in its possession, regardless of whether they are incorporated into a system of records. *See Maydak v. United States*, 363 F.3d 512, 516, 518–19 (D.C. Cir. 2004); *Albright v. United States*, 631 F.2d 915, 916–17 (D.C. Cir. 1980). The Act defines a "record" as "any item, collection, or grouping of information about an individual that is maintained by an agency . . . and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual . . . ." 5 U.S.C. § 552a(a)(4). A "system of records" is defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." *Id*. § 552a(a)(5).

## A.

The Privacy Act provisions codified at 5 U.S.C. § 552a(e)(1-2) and (e)(9-10) apply in situations involving records incorporated into an agency's system of records. *See Maydak*, 363 F.3d at 515–16, 519. Appellants acknowledge that the records at issue were not part of the Department's system of records, but contend that they should be so deemed because the Department, as an agency subject to the Privacy Act, was required to incorporate them into that system. *See* Appellants' Br. at 49–50 & n.35. They fault the district court's rejection of this argument as "an undue over-reading of *Maydak*." *Id*. at 51. They maintain that the lack of physical incorporation into a system of records is not dispositive of the question whether the records at issue were "'functionally,'" and thus legally, "within an appropriate personnel records system . . . ." *Id*. at 51 n.35. To so hold, they continue, would not be in keeping with this court's Privacy Act jurisprudence, which, "[r]ecognizing the [Privacy] Act's varied ambiguities, . . . ha[s] consistently turned back 'neat legal maneuver[s]' . . . attempted by the

government that, while literally consistent with the Act's terms, were not in keeping with the privacy-protection responsibilities that Congress intended to assign to agencies under the Act." *Id.* at 51 (quoting *Pilon v. U.S. Dep't of Justice*, 73 F.3d 1111, 1118 (D.C. Cir. 1996)).

Appellants' argument regarding the "functional" incorporation of the "deselection" records into the Department's system of records appears only in a footnote to their opening brief, and, as the Department notes, this court has observed that "[w]e need not consider cursory arguments made only in a footnote . . . . " Appellees' Br. at 48 n.6 (citing *Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999)). The obstacle to reaching appellants' "functional" argument, however, is not its placement in a footnote but their failure to make this argument in the district court. *See Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1117 (D.C. Cir. 2010). They offer no exceptional circumstances for not doing so. Indeed, given our remand in *Maydak*, the argument was available to them; in that case the court remanded for a determination of whether a set of photographs maintained by the Bureau of Prisons was a system of records under the Privacy Act, in light of "the agency's function, the purpose for which the information was gathered, and the agency's actual retrieval practices and policies." 363 F.3d at 520 (quoting *Henke v. U.S. Dep't of Comm.*, 83 F.3d 1453, 1461 (D.C. Cir. 1996)). Instead, in the district court appellants argued that because the Department was required to maintain the "deselection" records within its "system of records," a court must deem them to be part of that system. *See* Pls' Consol. Mem. of Points and Authorities in Opp. to Defs' Motions to Dismiss at 18–19 (Jan. 9, 2009); *see also Gerlich*, 659 F. Supp. 2d at 16–17. This is no minor distinction. The "functional" approach now urged by appellants hinges on questions of how the Department organized and used the "deselection" records; the approach urged by appellants in the

district court hinges on the question whether the Department had a legal obligation to place those records in its system of records and involved no functional inquiry. Under the circumstances, the "functional" argument is not properly before this court. Because appellants offer no legal support for deeming the "deselection" records to be in a system of records, the district court properly dismissed their claims under § 552a(e)(1-2) and (e)(9-10). The district court also properly dismissed their claims under § 552a(e)(6) because the "disseminat[ion]" of records is not at issue.

**B.**

Appellants' remaining Privacy Act claims arise under 5 U.S.C. § 552a(e)(5) and (e)(7). Subsection (e)(5) requires an agency to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." Section 552a(g)(1)(C), in turn, "provides a civil remedy if an agency fails to satisfy the standard in subsection (e)(5)," *Deters v. U.S. Parole Comm'n*, 85 F.3d 655, 657 (D.C. Cir. 1996), and "applies to '*any record*,' and not [only] 'any record within a system of records' . . . ." *McCready*, 465 F.3d at 12. The obligations the Privacy Act established in subsection (e)(5) therefore apply even when the agency does not maintain the records at issue in its system of records.

Subsection (e)(7) mandates that an agency "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." In view of "Congress' own special concern for the protection of First Amendment rights," this court has concluded that the obligations imposed by subsection (e)(7)

are not limited to records maintained in a system of records. *Albright*, 631 F.2d at 919.

The Privacy Act creates a cause of action for violations of § 552a(e)(5) whereby "an individual may bring a civil action against the agency" when it "fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination . . . and consequently a determination is made which is adverse to the individual." 5 U.S.C. § 552a(g)(1)(C); *see also Deters*, 85 F.3d at 657. With regard to § 552a(e)(7) violations, the Privacy Act provides an avenue of relief through a more general provision, which permits an individual to file suit when an agency "fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual." 5 U.S.C. § 552a(g)(1)(D); *see also Chao*, 540 U.S. at 619. Additionally, the Privacy Act allows plaintiffs to seek money damages in lawsuits brought under § 552a (g)(1)(C) or (g)(1)(D) when "the agency acted in a manner which was intentional or willful." 5 U.S.C. § 552a(g)(4). For appellants to prevail in their lawsuit, then, they must demonstrate that the creation of annotations and printouts from internet searches violated § 552a (e)(5) or (e)(7); that the Screening Committee's adverse determination, i.e., its decision to "deselect" them for interviews, was based on these records; and that it acted intentionally or willfully in creating the records.

The failure of senior Department officials to preserve the "deselection" records makes it more difficult for appellants to show that they were among the applicants whose materials were annotated or supplemented with internet printouts by the Screening Committee. As the district court explained:

> The Justice Department does not deny that DOJ officials conducted this [inappropriate political and ideological screening] activity with respect to some, but not all, applicants to the 2006 Honors Program. Because the relevant files have been destroyed, however, DOJ maintains that plaintiffs cannot prove that inappropriate records were created about them specifically.

*Gerlich*, 828 F. Supp. 2d at 287. Appellants moved in the district court for a spoliation sanction as a result of the destruction of the relevant records, requesting that the district court draw the adverse inference that improper records were in fact created with regard to appellants' applications and that such records were the reason for their "deselection." *See id.* at 294. The district court rejected their argument under the Federal Records Act, 44 U.S.C. § 2901 *et seq*., and found no regulation or policy prohibited the destruction pursuant to the Department's records disposition schedule. *See id.* at 300–02.

The Department maintains that appellants waived a separate legal ground for their requested inference, referencing their counsel's statement at a motions hearing that the duty to preserve the records under the Federal Records Act "has nothing to do with whether litigation was pending then or upcoming," Tr. Oct. 14, 2011 at 82. In acknowledging that duty stands apart from a separate preservation ground, i.e., a duty to preserve evidence when litigation is reasonably foreseeable, appellants' counsel was not denying that separate ground exists. The separate ground was set forth in appellants' opposition to summary judgment, citing cases, and supplemental briefing where they argued, also citing case authority, that a duty arose in light of the Screening Committee's "violation of basic civil service principles," *see* Pls.' Supp. Mem. Nov. 10, 2011 at 7 & n.11; *see also* 2008 Report at 93, and in light of the destruction

of the "deselection" records by Department officials who should have known they were likely to be relevant to a Department investigation and future litigation. Any doubt about whether appellants intended to assert this separate ground for a spoliation sanction created by counsel's statement at the motions hearing was dispelled when they thereafter included the separate ground in supplemental briefing ordered by the district court. *Cf. Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 779 (D.C. Cir. 2012).

This court has recognized that a negative inference may be justified where the defendant has destroyed potentially relevant evidence. *See Talavera v. Shah*, 638 F.3d 303, 311 (D.C. Cir. 2011); *Webb v. District of Columbia*, 146 F.3d 964, 972–73 (D.C. Cir. 1998); *Shepherd*, 62 F.3d 1475. In *Talavera*, a Title VII case, a selecting official's negligent destruction of relevant records violated regulatory obligations to preserve his records: for two years under OPM regulations, 5 C.F.R. § 335.103(b)(5) (2004), and for one year under EEOC regulations, 29 C.F.R. § 1602.14 (2003). 638 F.3d at 312. The court concluded that a negative spoliation inference instruction to the jury was warranted because the regulations were designed to protect the party moving for the sanction and the destroyed records "represented [the plaintiff's] best chance to present direct evidence" proving her claim. *Id*. The fact that the records were destroyed as part of the defendant's "'typical' practice" was insufficient to overcome the duty to preserve them. *Id*. The court noted that other circuits had similarly concluded a written policy requiring document preservation sufficed. *Id*. at 311 (citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 108–09 (2d Cir. 2001); *Favors v. Fisher*, 13 F.3d 1235, 1239 (8th Cir. 1994); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1419 (10th Cir. 1987)).

Because in *Talavera,* OPM and EEOC regulations created the duty to preserve the relevant documents, the court had no

16

occasion to decide whether a negative spoliation inference was warranted where the duty to preserve documents arose from a source other than a statute or regulation. Other circuit courts of appeals have held that a duty of preservation exists where litigation is reasonably foreseeable. In *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998), the case cited in appellants' supplemental briefing in the district court, the Second Circuit held that the duty may arise when a "party has notice that the evidence is relevant to litigation — most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party *should have known* that the evidence may be relevant to future litigation." *Id.* (emphasis added). The circuit courts to address the issue have adopted this approach. *See Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 554 (6th Cir. 2010); *Burlington N. and Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007); *Ritchie v. United States*, 451 F.3d 1019, 1024 (9th Cir. 2006); *Silvestri v. General Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001). We now do likewise. Once a court has determined that future litigation was reasonably foreseeable to the party who destroyed relevant records, the court must then assess, as in *Talavera*, 638 F.3d at 312, whether the destroyed records were likely relevant to the contested issue. *See Kronisch*, 150 F.3d at 127. The duty is triggered as well by a reasonably foreseeable Department investigation, which here, given the egregious and notorious violation of Department policy and civil service laws by senior Department officials, *see* 2008 Report at 93, was not merely foreseeable but likely.

Unrebutted evidence demonstrates that Department officials in control of the printed, annotated applications were on notice that Department investigation and future litigation concerning the 2006 Honors Program improprieties were reasonably foreseeable. Nevertheless, they intentionally destroyed these

records. Elston and the Director of the Recruitment Management Office received multiple complaints from high ranking Department officials and other employees about the handling of the 2006 attorney hiring process and were aware of the perception that it had been politicized. The controversy that began boiling up around the "deselections" in late 2006, before the annotated applications and appended printouts were destroyed in early 2007, gave fair warning to those senior officials that the Department's investigation of such allegations and future litigation were reasonably foreseeable, indeed likely. The officials involved in the 2006 Honors Program applicant screening were lawyers working for a department regularly involved in litigation who could hardly not have known, given the egregious and notorious factual circumstances, that the working copies of the applications, with their annotations highlighting reasons for "deselection" and the accompanying internet printouts attached to support a particular "deselection" decision, would be relevant to the Department's investigation and likely future litigation. Elston's assistant, however, placed the applications in a "burn box," 2008 Report at 69, consistent with Elston's "practice not to keep documents that we didn't need anymore." Elston Dep. 138:22 - 139:1, Aug. 10, 2010. McDonald related that Elston had mentioned the record destruction to her, stating "at least that's one thing I did right." McDonald Dep. 262: 1-2, July 27, 2010. Viewing the evidence in the light most favorable to appellants, and granting them all favorable inferences that are reasonable, as must be done in considering whether summary judgment is appropriate, *see Talavera*, 638 F.3d at 308, a reasonable trier of fact could find that the record destruction was neither accidental nor simply a matter of utilizing the Department's record destruction schedule.

On the question whether appellants can show that the destroyed documents contained information relevant to their claims, *see Kronisch*, 150 F.3d at 127–28, the matter is slightly

more complex. In an inquiry that "is unavoidably imperfect . . . in the absence of the destroyed evidence, [a court] can only venture guesses with varying degrees of confidence as to what that missing evidence may have revealed." *Id.* at 127. The movant must make "some showing that the destroyed evidence would have been relevant to the contested issue." *Id.* Without identifying a fixed quantum of evidence, the Second Circuit cautioned "that care should be taken not to require too specific a level of proof." *Id.* at 128 (internal quotation marks and citation omitted). Likewise, the Ninth Circuit concluded that in situations where "the document destruction has made it more difficult for a party to prove that the documents destroyed were relevant," the "burden on the party seeking the adverse inference is lower," and "the trier of fact may draw such an inference based even on a very slight showing that the documents are relevant." *Ritchie*, 451 F.3d at 1025.

Appellants Faiella and Herber have shown that summary judgment was inappropriately granted on their Privacy Act claims under § 552(e)(5) and (e)(7) and that the denial of their motion for a spoliation sanction was error. The proffered evidence showed the following: First, as a general matter, McDonald conducted internet searches on 2006 Honors Program applicants' ideological affiliations and, in multiple instances, annotated the candidates' printed applications with information gleaned from her online research. Second, in some instances McDonald printed out similar information from the internet and attached it to the working copies of the applications. Third, a search of McDonald's computer hard drive revealed that she had performed internet searches on Faiella and Herber and found information on Faiella's opposition to military recruiters on Cornell University's campus and Herber's election to a seat on the City Council of La Crosse, Wisconsin as a member of the Green Party. This information regarding their First Amendment activities was not contained in the materials Faiella and Herber

submitted as part of their 2006 Honors Program applications. Given the 2008 Report's account of McDonald's aversion to approving applicants with liberal political party affiliations or who had been involved in organizations committed to progressive causes, it is reasonable to infer that this information would have raised "red flags" for McDonald and could have resulted in her deciding to annotate their applications or to attach printouts to them from the websites she visited.

Additionally, the proffered evidence is sufficient to support a reasonable inference that the destroyed records could have supported Faiella and Herber's claims that their "deselection" for interviews was based on the creation of these records in violation of 5 U.S.C. § 552a(e)(5) and (e)(7). The Department suggests that there was adequate information of liberal affiliations in Faiella's and Herber's applications for McDonald to have based her "deselection" decision on the applications themselves, and that although improper, this would not constitute a Privacy Act violation. Because appellants have not pursued their Civil Service Reform Act claims on appeal, the court has no occasion to address the inappropriateness of such a "deselection" under the civil service laws, but there remains another question that cannot be ignored: if the liberal affiliations listed on Faiella's and Herber's applications were enough to trigger their "deselection," then why would McDonald have performed additional internet research on these two applicants while under intense time pressure to complete the review process? *See* 2008 Report at 83. Although the proffered evidence does not prove that the adverse decisions were linked to improperly collected records, and so entitle Faiella and Herber to summary judgment, it is sufficient to draw an inference of relevance where, as here, a party's destruction of evidence has made it more difficult for the plaintiff to establish the relevance of that evidence to the disputed issue of material fact. This is so despite the fact that, as the Department suggests, appellants

could have asked McDonald during her deposition whether she made annotations on their applications. Even if her response confirmed her deposition statement through counsel that she did not recollect the applications, this would not be dispositive of whether she had created records based on her internet searches on Faiella and Herber. It speaks only to her recollections, not to whether she actually created such records. On the other hand, because Saul has not proffered comparable evidence as to his 2006 Honors Program application, there is no basis for a reasonable inference of relevance as to him and the district court properly granted summary judgment on his § 552a(e)(5) and (e)(7) claims.

Because the complaints lodged by Department attorneys about the politicization of the 2006 attorney hiring process made the Department's investigation and future litigation reasonably foreseeable and thereby created a duty to preserve the Honors Program records, the court need not decide whether a separate obligation of preservation existed under the Federal Records Act or other statutes and regulations

## C.

Finally, appellants' challenge to the district court's denial of class certification as an abuse of discretion fails for the following reasons. First, appellants concede that in filing the motion for class certification four months late they failed to comply with a local timing rule, D.C. DIST. CT. LOCAL R. 23.1(b), and that they never asked for an extension of time to file (as the Department noted in its opposition). Although in the district court appellants were on notice that the Department opposed their motion as untimely, they did not argue in reply that Local Rule 23.1(b) conflicts with FED. R. CIV. P. 23(c)(1)(A) when attempting to justify their tardy filing; instead, appellants first raised this argument in moving for reconsideration. Under the circumstances, an appellate court is

unlikely to address an issue first raised in the district court on reconsideration, *see, e.g., Office Comm. of Unsecured Creditors of Color Tile v. Coopers & Lybrand, LLP*, 322 F.3d 147, 159 (2d Cir. 2003).

Second, by failing to include any relevant arguments in their appellate briefs, *see Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005), appellants fail to show that the district court's determination that there was no excusable neglect for the late filing, *see Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 395 (1993), was an abuse of discretion, *see In re Vitamins Antitrust Class Actions*, 327 F.3d at 1209. They contend, however, that the denial of class certification should be reversed "for the reasons fully set forth in support of their interlocutory petition," which was denied, *see In re Saul*, *et al*., No. 10-8003 (D.C. Cir. Oct 5, 2010), while stating in their brief only that the district court "misapplied existing law . . . and that it had mistakenly balanced all equities involved," Appellants' Br. 55. This court has long cautioned that "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work." *Schneider*, 412 F.3d at 200 n.1. Appellants' explanation that they adopted "the 'triage approach'" because appellee's counsel would not consent to an extension of the 14,000-word space limitation, *see* Reply Br. 26 n. 20, fails to reconcile its approach with our rules, *see* D.C. CIR. R. 32(a)(7), or to persuade us that they could not have presented their challenge within the 14,000 words of their opening brief.

Accordingly, we reverse the grant of summary judgment on Faiella and Herber's claims under the Privacy Act, 5 U.S.C. § 552a(e)(5) and (e)(7). On remand the district court shall construe the evidence in light of the negative spoliation inference, which would permit a reasonable trier of fact to find

that they were harmed by the creation and use of the destroyed records.  Otherwise we affirm.